BROWN, P. J., and CULLEN, J., concurred.

Order affirmed, with costs.

---

In the Matter of the Application of HUBERT O. THOMPSON, as Commissioner of Public Works of the City of New York, etc., to Acquire Certain Water Rights, etc.

CAROLINE LAZZARI and Others, Appellants; THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Respondent.

*Diversion of the water of a river — measure of damage to riparian owners — when only nominal damages will be awarded — mill owners.*

In a proceeding instituted by the commissioner of public works of the city of New York to assess damages, based upon the diminution of the water flowing through the Bronx river by reason of the construction of a dam, it appeared that the quantity of water flowing through the Bronx river had not been diminished, but, on the contrary, that it had actually been increased in the dry season by the construction of such dam. In some cases the commissioners awarded only nominal damages.

*Held,* that no principle of law was violated by their failure to allow damages where no property was appropriated.

Where no legal errors appear in the proceedings of commissioners appointed to assess damages caused by a public improvement, and they have adopted no erroneous rule for the allowance of damages in making their award, an appellate court will not interfere with the report of such commissioners upon the mere question of damages unless the amounts awarded are so great or so small as to be palpably unjust.

Riparian proprietors have the right to the natural flow of the water as an appurtenance to their land; they have no property in the water, and it has no value to them independent of their land, and its value to them is measured by the injury which its diversion would inflict upon their land.

Mill owners and owners of water power upon a river, the water of which has been diverted for a public improvement, should not be allowed a sum sufficient to pay the cost of replacing by steam power the water power of which they have been deprived. The true measure of damages in such a case is the effect of the diversion of the water upon the property to which it was appurtenant; if its actual value has been reduced, the amount of such reduction in value or the difference between the actual value after the diversion of the water and its value if there had been no diversion.

APPEAL by the claimants, Caroline Lazzari and others, from an order of the Supreme Court, dated the 26th day of March, 1894,* confirming the report of commissioners of appraisal; also, by the claimants, Charles Seidler and others, from the report of the commissioners of appraisal dated the 26th day of March, 1894, and from an order of the Supreme Court made at the Orange Special Term on the 18th day of August, 1894, and entered in the office of the clerk of the county of Westchester, confirming the report of said commissioners of appraisal; also, by the claimants, Thomas Bolton and others, from the said order dated August 18, 1894, and entered in the office of the clerk of Westchester county, confirming the report of commissioners of appraisal, and from the report and supplemental report of said commissioners; also, by the claimants, Marietta Z. Siegrist and others, from the said order dated August 18, 1894, entered in the office of the clerk of the county of Westchester, confirming the report of said commissioners of appraisal.

*Martin J. Keogh*, for David Lydig, appellant.

*James A. Deering* and *Geo. G. Munger*, for Thomas E. Woolf, appellant.

---

* No order of March 26, 1894, appears in the case.

*J. C. Sanders*, appellant, in person.

*Arthur Furber*, for various claimants, appellants.

*James R. Marvin*, for Sarah L. Myers and Mary A. Littlewood, appellants.

*Ralph Hickox*, for claimants, appellants, parcels 254 and 255.

*Alex. Thain*, for claimants, appellants, interested in parcels 272–279, 281–283, 285, 286, 288, 288a, b and c, and 284.

*Wm. H. Clark* and *Nelson J. Waterbury*, for the city of New York, respondent.

DYKMAN, J.:

This is an appeal from an order confirming the report of commissioners of appraisal.

The proceeding was instituted by the commissioner of public works, and the claims for damages are based upon the diminution of the water flowing through the Bronx river, by reason of the construction of the dam at Kensico. There is no claim in this proceeding for property taken or appropriated.

The Kensico dam was constructed across a gorge, through which the Bronx river flowed. The stream was small at that point in the dry season, and it appears from the evidence in this case that, when the dam was in course of construction, the stream was turned aside and all the water passed through a five-inch pipe.

After the completion of the dam the reservoir was filled and the water was conducted through pipes to the reservoir near Williams Bridge.

The maintenance of the dam and the passage of the water through the pipe line constituted a diversion of the water, and it became necessary to quiet the claims of the riparian proprietors along the Bronx river for damages which might result to them from the decrease of the water in the river by reason of such diversion.

To that end commissioners of appraisal were appointed for different sections of the river, and they have all made their reports to the court, which have been duly confirmed.

The commissioners in this proceeding had charge of the section of the river from Williams Bridge south.

In some cases the commissioners have awarded substantial damages, in others nominal damages, and in others they have allowed nothing.

No principle of law is violated by the failure to allow damages where no property is appropriated.

Especially will that rule prevail in this case in consequence of a fact which may as well be stated here.

It now turns out that the quantity of water flowing through the Bronx river has not been diminished, but, on the contrary, it has been actually increased in the dry season by the construction of the Kensico dam.

That fact was established by unquestionable evidence.

Lewis S. Onderdonk, who formerly resided near the dam, stated the fact generally, and then testified as follows : " A number of years ago I plowed the ground below the dam that was owned by an old man named Davis; I plowed a strip of ground between Bronx river and the highway leading to White Plains, and the ground there then was just as dry as it was in any other part of the farm, and to-day its banks seem to be saturated with water, so that at the foot of this slope where I ploughed it is now grown up with flags like a pond, which was surprising to me until it was explained that this water was filtering through the ground on the eastern side of the dam."

The Davis property was immediately below the dam, and then came the land of James D. See, within half a mile of the dam. Mr. See was examined as a witness in this proceeding, and it is to be gathered from his testimony that the dam was constructed in this way : A stone wall was first built across the gorge, and then earth was filled in both on the upper and lower side of the wall. It is usually denominated an earth dam.

In relation to the quantity of water, his testimony is as follows : " I lived there at the time this dam was constructed, and was there almost daily; in the construction of the dam they blew out a good many rock to get a good foundation, it was lime rock, and they opened a couple of large veins; I think there were two; I think I testified before another commission that there were two; there was quite a large volume of water from those two veins, and they were below where the mason work of the present dam is; after they built

the mason work they filled in below with dirt; that water from those two veins, and they are large, runs through this dirt, and comes out of the bank below and out of the bank wall, they had to take large stone from the bank wall to let that water out and save the bank; that water flows into the bed of the brook below the dam; those veins are deep, and there never has been a drought yet that affected them; during the times of drought we get water from those veins below the dam that we did not get before, and the consequence is that in times of drought the water which is below the dam in coming through my place the volume is larger than it was in times of drought before the erection of the dam, and the quality of the water is a great deal better for us. That is my explanation. * * *

"During the time of the drought, I think it was two years after the completion of the dam, I watched that stream below the dam, and made a remark at the time that in my judgment there was more water running through that dam than ran through the dam in times of drought before the dam was built. I am of the opinion still; I am sure of it. I would not change back, if I owned property to-day, for $1,000. I think I was benefited $1,000 instead of being damaged $1,500, that the city gave me."

George S. Birdsall, the chief engineer of the department of public works of the city of New York, was examined as a witness, and upon his cross-examination testified as follows: " Q. You do not mean to say that the water that runs down the Bronx river from that point down to the Lorillard point is as much now as it was before the construction of that dam, do you? A. In dry seasons, yes. Q. Do you mean to say that in dry seasons that dam does not retain any water? A. There is as much water passing it as there was going past it before. Q. You mean to say that it does not retain any water in dry spells? A. Only what is stored back of it. Q. But some of that comes down in dry spells? A. Certainly. Q. Then it does during dry spells prevent water from coming down beyond it, which would come down were it not there? A. No, sir. Q. Where would that water remain? A. It goes through the rock of the Kensico dam; by actual measurements in dry weather there is just as much water passes that dam as there was passing it before this construction; the water being stored above the dam and being

higher than it is below, the pressure forces it through the rock underneath the bottom of the dam.   Q. Then the dam is not perfectly constructed?   A. There is no dam in the world perfectly constructed."

That evidence stands upon the record unanswered, and constitutes a complete refutation of the theory upon which the claims for damages in this proceeding are presented.

Such demands are all based upon the diminution of the quantity of water in the Bronx river in the dry season by reason of the construction of the Kensico dam.

They relate solely to the dry season, because at all other times the flow of water is plentiful, and the evidence recited shows that instead of being diminished the flow of water is increased in the dry season by the construction of the dam.

As the complaints of the appellants relate only to the insufficiency of the awards for damages, and the evidence shows that no damage has resulted from the cause assigned, our examination might terminate here, yet it may be well to proceed somewhat further.

There are no legal errors in the proceedings of the commissioners, and they have adopted no erroneous rules of damage in making their awards.   Under such circumstances an appellate court will not interfere with the report of commissioners upon the mere question of damages unless the amounts awarded are so great or so small as to be palpably unjust.

That rule is settled in this State, and in this district we have had many occasions for its application.   (See *Matter of Staten Island R. T. Co.*, 47 Hun, 397.)   The reason for the rule has been stated in varied language as follows: The commissioners are required to view the premises, and by such examination they obtain a knowledge of the location and condition of the property and its availability, which is not recorded, and which is never presented to the appellate tribunal.   Such knowledge is deemed so important that the law contemplates the possibility of an award based upon a view alone, for the commissioners are only required to take the proofs offered by the parties, and if none is offered, they make their award without it.

Again, the commissioners are authorized to seek information by outside inquiries prosecuted by themselves alone and to act upon the

knowledge thus obtained. That evidence also remains unwritten and is never presented to the appellate court.

So it is, therefore, that while the commissioners may be controlled entirely by the knowledge they derive from those two sources, the appellate court knows nothing of it. Moreover, when testimony is taken by the commissioners, it necessarily consists almost entirely of the opinions of witnesses respecting values, and no tribunal is ever bound by such opinions; especially is that so with respect to commissioners of appraisal.

Opinions respecting values of property and resulting damages usually differ very widely, and the commissioners are required to exercise their own judgment in respect thereto.

These considerations are sufficient to justify the reluctance with which the courts interfere with the awards of commissioners upon the mere question of their size. So far from being open to criticism, we deem the awards ample in size in all the cases before us in any view which can be taken.

The greatest complaints are made by mill owners, but it is a fact proved in these cases, as well as derived from history, both past and current, that water power in this country has ceased to be valuable. The centers of trade have changed and steam power has superseded water power.

Steam power can be planted at any place where it is required by business, while water power can only be utilized where it is found, and business must seek it there.

Great complaint is made by the owners of mills and water power on the river, and their contention is that the commissioners should have allowed them a sum sufficient to pay the cost of replacing by steam power the water power of which the owners had been deprived by the diversion of the waters of the Bronx river.

That contention ignores the rule of law which prescribes the measure of compensation for property appropriated for public use, and, without any reference to the decrease in value of the property by reason of the diversion of water, requires the allowance of a sum of money which will pay for a steam engine of sufficient power to replace the water power.

Several engineers were permitted to testify respecting the cost of supplying the water power, or rather of reproducing the same by

steam. Also in respect to the amount of money it would require to produce an annual income at five per cent to meet such expense annually, but all the testimony of that character was erroneously admitted. It was irrelevant and immaterial in any and every view. The riparian proprietors had the right to the natural flow of the water as an appurtenance to their land. They had no property in the water, and it had no value to them independent of their land or real property, and, therefore, its value to them was measured by the injury which its diversion inflicted upon their real property to which this water was appurtenant.

The question before the commissioners, therefore, was what in fact had been the effect of the diversion of the water upon the property to which it was appurtenant. Was its actual value reduced? If it was, the amount of such reduction in value, or the amount of the difference between the actual value after the diversion and its value if there had been no diversion of the water, was the measure of compensation.

Such being the rule of damage, all the testimony in relation to the replacement of the water power by steam was erroneous.

The appellants cannot complain of the error, however, because the testimony was introduced by them, and the city cannot assign the admission of the testimony as error because it has not appealed.

It is probable, however, that the testimony was harmless as it was not followed by the commissioners, and there is nothing to show that they adopted any erroneous rule of damage.

The theory upon which the claimants in these cases proceed is this : They take the drainage area of the Bronx river from its source to its mouth, and the drainage area of the river above the dam, and claim that the proportion of the latter to the former shows the proportion of the water diverted.

That theory leaves out of view entirely the effect of impounding the water in the reservoir, and makes diversion equivalent to diminution of the stream.

Moreover, it includes the wet season as well as the dry, while in the former there can be no injury as we have seen because the river is always full, and in the latter we have seen that there is no diminution.

It is stated several times in the points of the respective appellants

that there was a conceded diversion of the water, by which it seems to be meant that the engineers assumed such diversion in making their calculations. If anything further is intended it is sufficient to say that no such concession was justified.

After a most careful examination we find no cause for interference with the report of the commissioners or with the order for its confirmation, and the order should be affirmed, with costs.

CULLEN, J., concurred; BROWN, P. J., not sitting.

Order affirmed, with costs.