In the Matter of the Application and Petition of WILLIAM BROOK-FIELD, as Commissioner of Public Works of the City of New York, Appellant, for and on Behalf of the Mayor, Aldermen and Commonalty of the City of New York, under Chapter 189 of the Laws of 1893, to Acquire Certain Real Estate as the Term "Real Estate" Is Defined in Said Act, for the Purpose of Providing for the Sanitary Protection of the Sources of the Water Supply of the City of New York.

DE WITT C. SARLES, Claimant, Respondent.

*City water supply — when the bed of a pond is of only nominal value where the title to the riparian upland and the right to flood the bed of the pond have already been acquired — its value as the foundation of a reservoir not considered.*

In 1864 the riparian owners upon the outlet of a non-navigable fresh-water pond in Westchester county procured the right to raise the water of that pond twelve feet by means of deeds which conveyed to such riparian owners the land which would be overflowed when the waters of the pond were raised twelve feet above the original level. Such deeds contained a provision that if the riparian owners should cease to use the lands for the purpose mentioned, the grantor might buy back such land at a price to be determined in the manner fixed by the deed. Subsequently the city of New York, for the purpose of its water supply, purchased the rights of the riparian owners below the pond and also the uplands adjoining the pond.

In a proceeding thereafter instituted by the city to condemn the land compos-
ing the bed of the original pond and that flooded by raising the waters of such
pond twelve feet, it was

*Held*, that the rights of the original owners of such lands were of such insignifi-
cant practical value that an award of a purely nominal sum therefor should be
affirmed;

That, in determining the value of the bed of the pond, its value as the foundation
of a reservoir for a municipal water supply could not be considered.

HIRSCHBERG, J., dissented.

APPEAL by the petitioner, William Brookfield, as commissioner
of public works of the city of New York, from that part of an
order of the Supreme Court, made at the Westchester Special Term
and entered in the office of the clerk of the county of Westchester
on the 21st day of December, 1901, which sets aside the report of
the commissioners appointed in the proceeding in so far as such
report relates to parcel No. 61 and twelve acres of parcel No. 62.

*Henry T. Dykman*, for the appellant.

*James Dunne*, for the respondent.

WOODWARD, J.:

William Brookfield, as commissioner of the board of public works,
instituted the present proceeding, under the provisions of chapter
189 of the Laws of 1893 (as amd.), for and in behalf of the mayor,
aldermen and commonalty of the city of New York, to acquire cer-
tain real estate as defined in said act, in connection with the water
supply of the said city.   In September, 1895, Eugene B. Travis,
Francis Larkin and John J. Quinlan were duly appointed as com-
missioners of appraisal, subsequently qualifying, and in virtue
whereof, and pursuant to the provisions of said act, the city of New
York became seized in fee of parcels 61 and 62, the awards in
respect to which have been set aside by the court at Special Term,
and are now before us for review.

Prior to 1864 Byram pond was a non-navigable fresh water pond,
formed or enlarged by a dam on the west branch of the Byram
river in the town of North Castle, Westchester county.   The outlet
of this pond, known as Byram river, runs in a southerly direction
about one mile to the Connecticut State line, thence several miles
through the said State until it reaches Long Island Sound.   Some
distance below the original pond there existed for many years the

usual old-fashioned sawmill, formerly owned by John P. Tripp, and now owned by the city of New York, and this mill owner had the right to the maintenance of the pond for the use of this mill. Josiah Wilcox and other manufacturers, who owned mills bordering on the Byram river, in the town of Greenwich, Conn., used the natural flow of the waters of this branch of the Byram river as a part of their power. The original bed of Byram pond at this time contained about 120 acres of land, and parcel No. 62 included a part of the original pond in the town of Bedford, and parcel No. 61 a part of the pond in the town of North Castle. In the year above mentioned Mr. Wilcox, with four other manufacturers, in order to procure storage for water for the use of their mills some miles below this pond and in the neighboring State, entered into negotiations with the owners of lands bordering on Byram river and Byram pond, and lying beneath the waters of the pond, to secure title to the necessary land to raise the waters twelve feet by erecting a new dam about one-quarter of a mile below the old outlet. Mr. Wilcox and those operating with him were riparian owners upon Byram river, the outlet of this pond, and were not diverting the waters of this reservoir from their natural channel, but were simply holding the water in reserve to produce a more uniform flow throughout the year. They first procured from Ebenezer G. Platt the land upon which the dam was built and all lands that he owned that would be flooded by raising the waters of the old Byram pond twelve feet above the original level. Mr. Wilcox procured deeds from all persons owning land around the pond and having interests in the bed of the pond, including the respondent's ancestors in title, vesting him and his associates with the right to raise and lower the waters of the pond twelve feet. This result was secured by means of two transactions, the first of which deeded to Mr. Wilcox and his associates a certain portion of the uplands adjoining the Byram pond with the hereditaments and appurtenances, which are described as "being all the land on both sides of the Byram river and Byram pond, that will be overflowed by the waters of Byram river and Byram pond, in consequence of the erection of a dam across said Byram river, southerly by lands hereby conveyed of sufficient height to raise the waters in Byram pond eight feet and two-tenths above its present level, and the above described land is conveyed by

the party of the first part to the party of the second part only for the purpose of being flowed by said pond, and in case the party of the second part should not use said land for the purpose above named, then the party of the first part, his heirs and assigns shall buy back the land hereby conveyed (at) such price as may be agreed upon between the parties to these presents, and in case of a disagreement between the parties, then each shall choose a disinterested person," etc., and the second deed provided, under the same terms, for the increase of depth of water to twelve feet. All of the deeds were in form and substance the same, in so far as they have any bearing upon the question now before us, and the clear intent of the parties was that Mr. Wilcox and his associates should take an absolute fee in so much of the land as should be necessary, with a covenant in the nature of a pre-emption right (see 2 Bouv. Dict. [Rawle's Rev.] 724, title Pre-emption Right) on the part of the party of the first part to repurchase the property so conveyed in the event of its abandonment by the parties of the second part for the purpose of flowage. That is, the parties who were, at the time of making the sale, riparian owners along the pond and river, did not want to leave the matter in such a position that the purchasers at some future time might tear out the dam and leave them with a strip of land between them and the water; they wanted to preserve to themselves the advantages of riparian owners, and to this end the clause was introduced which preserved to them, not any interest in the land conveyed, but a right to repurchase should the time ever come when the waters should be permitted to recede to the old level. Whether we view this question in the light of the presumption that Mr. Wilcox and his associates by becoming the owners of the lands bounding the Byram pond and river thus became the owners of the soil underlying the waters (*Smith* v. *City of Rochester*, 92 N. Y. 463, 473; *Gouverneur* v. *N. I. Co.*, 134 id. 355, 364), or whether we construe the grant to be confined to the lands which were actually described, it is clear that the grant contemplated the right to the use of the land which was at the foundation of the original pond and river bed so long as the lands should remain the property of Mr. Wilcox and those interested in his enterprise, for the water could not be maintained in the pond at a height of twelve feet above its then level without the land on which it

was founded. The original owners of the fee of the land under the river and pond had no right to divert the water, and even if it be conceded that no part of the fee to the land under the original river and pond were conveyed to Mr. Wilcox by the deeds in evidence, the ownership is, nevertheless, subject to every easement and servitude necessary to the use of the water by the riparian owners, so far as they may be entitled to the same. (*Sweet* v. *City of Syracuse*, 129 N. Y. 316, 336.) There can be no doubt that up to the time that the city of New York purchased the rights of riparian owners in the State of Connecticut, the owners of the fee to the land which was flowed by Byram river and Byram pond had no very tangible interest in the land, except as riparian owners, and as was said in *Gouverneur* v. *N. I. Co.* (*supra*, 364), "the value, such as they have, of small non-navigable lakes and ponds as a general rule is mainly in their relation to the adjacent lands." The city of New York, by extinguishing the rights of riparian owners below the pond, became vested with the rights to which the riparian owners were entitled in the river and pond, and it is not to be doubted that it has a perfect title in the land which was conveyed to Mr. Wilcox and his associates and subsequently purchased by the city, for the purpose of maintaining the water at a height of twelve feet above the original level. So that, conceding the title of the land under the original river and pond to be in the parties who are now claiming compensation for the taking, it is so entirely intangible, so utterly valueless as a practical property right, that it cannot be said that the commissioners, who are not confined to the oral testimony in forming their judgment (*Matter of Gilroy*, 78 Hun, 260, 261), have adopted any erroneous theory in establishing the compensation for these rights at a purely nominal sum. In the absence of palpable error in the principle on which the damages are awarded, the acts of commissioners in cases of this character are not to be set aside. (*Matter of Gilroy*, *supra ; Matter of Brooklyn El. R. R. Co.*, 87 Hun, 88 ; *Harlem River & P. R. R. Co.* v. *Reynolds*, 50 App. Div. 575 ; *Matter of Daly* v. *Smith*, 18 id. 194 ; *Matter of City of Rochester*, 137 N. Y. 243, 246. See *City of Syracuse* v. *Stacey*, *No. 1*, 45 App. Div. 249, a case much in point.)

In this connection it should be stated that in the proceeding in which this appeal arises the city of New York has purchased, by

condemnation, all of the uplands of the adjacent owners, including those portions of the parcels here involved which are above the water line, paying for the same what appears to be a satisfactory price, and the only evidence on which there could be any recovery beyond a merely nominal amount, assuming the fee to be in the respondent, is that of a witness for the respondent, who estimates the value of the land as the foundation for a reservoir for a municipal water supply, basing his calculation upon the value of the water by the million gallons for domestic use. This is clearly an entirely improper basis of calculation. While the right to use the waters of this pond and river as it flows along in a body may become a property right, yet the water itself, the *corpus* of the stream, never becomes or, in the nature of things, can become the subject of fixed appropriation or exclusive dominion, in the sense that property in the water itself can be acquired, or become the subject of transmission from one to another. Neither sovereign nor subject can acquire anything more than a mere usufructuary right therein (*Sweet* v. *City of Syracuse*, 129 N. Y. 316, 335, and authorities there cited), and, as we have seen, the respondent's property rights consisted merely in the rights of riparian owners as the water flowed through the pond and the channel of the river, assuming the title of the city to the Wilcox purchase to have extended only to the land which was subsequently overflowed. The riparian owners along the Byram river below the pond had a right to an unobstructed flow of the waters of this pond, and the owners of the fee of the bed of the pond could not deprive them of this right. The city of New York, for the purposes of a municipal water supply, extinguished the rights of the lower riparian owners, and thus secured the right to divert the water to another point. The city thus became vested with the same rights which belonged to the riparian owners along the stream, and this included the right to have the water flow over the bed of the stream, and now that the city has purchased all of the property rights in the watershed, it is idle to say that this land under water, as to which the city owns the right to a continuous flow of the waters over the same, has any artificial value as the foundation for a storage dam. Even should the city abandon its right to maintain the water at a height of twelve feet above the original level, and the heirs of the original grantors should avail themselves of the right of

repurchasing the additional lands which were overflowed, there would still be the right of the city to the uninterrupted. flow of the stream over the bed of the pond and the river, and it is this land, with no environment of any commercial importance, which it is claimed the city should be called upon to pay for as the foundation of a storage dam. We are clearly of the opinion that the learned court has fallen into error in this matter, and that the report of the commissioners should have been confirmed in this, as in all other respects.

The order appealed from should be reversed, and the report of the commissioners, who have had the opportunity of a personal observation of the premises, should be confirmed.

GOODRICH, P. J., and JENKS, J., concurred; HIRSCHBERG, J., read for affirmance.

HIRSCHBERG, J. (dissenting):

I dissent from the decision which the court is about to make in this case. The appeal relates to that part of the order which refuses to confirm the action of the commissioners as to parcels Nos. 61 and 62, whereby the sum of one dollar was awarded in each case to be distributed among unknown owners. As I understand the reasoning of the prevailing opinion, it is based upon the theory that the fee of the bed of a pond is without substantial value where the right to maintain and use the water has been acquired by another than the owner. This seems to be in conflict with the theory of the decision of the former General Term of this department in *Matter of Gilroy* (85 Hun, 424), in which it was held that the availability of the property for use in connection with the water supply of the city of New York is an element of value. In that case Mr. Justice WILLARD BARTLETT in collating the authorities said (p. 427): " A similar rule as to the measure of compensation, where the power of eminent domain is exercised for the acquisition of reservoir sites, has been laid down in a number of cases. (*San Diego Land Co.* v. *Neale*,* 78 Cal. 63; *Spring Valley Water Works* v. *Drinkhouse*, 28 Pac. Rep. 681; *Alloway* v. *Nashville*, 88 Tenn. 512.) In the case last cited it is well said that market value 'includes every element of usefulness and advantage in the property. If it be use-

---

* *San Diego Land, etc., Co.* v. *Neale.*

ful for agriculture or for residence purposes, if it has adaptability for a reservoir site or for the operation of machinery, if it contains a quarry of stone or a mine of precious metals, if it possesses advantages of location or availability for any useful purpose whatever, all these belong to the owner, and are to be considered in estimating its value.'"

It seems to me that within the spirit of this authority the bed of a pond may possess value by reason of its location and adaptability. The one enables it to gather water, the other to retain it as in a reservoir. The fact that the city has acquired the right to maintain the water upon the bed and to use it for municipal purposes may affect the value of the fee, but does not necessarily destroy it; and the same may be said of the other circumstances detailed in the prevailing opinion by which the city has acquired rights in the surrounding territory. The fact still remains that the cup which gathers and holds the water is of some value in connection with the municipal use of the water rights. Otherwise the right to maintain and use the water could be acquired for a comparatively small sum on the ground that the fee was left intact, and the fee afterwards acquired at a nominal price on the ground that it was without value, inasmuch as the right existed in others to keep the land always immersed. But if the bed of the pond is of no value, it is difficult to imagine why the city should resort to expensive litigation for the purpose of acquiring it.

Order, so far as appealed from, reversed, and the report of commissioners confirmed, with ten dollars costs and disbursements.