UNITED STATES v. VILLAGE OF HIGH-LAND FALLS et al.

No. 150.

Circuit Court of Appeals, Second Circuit.

March 11, 1946.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

Abraham Kopald and Kopald & Hoft, all of Highland Falls, N. Y., for the Village of Highland Falls.

Hiram B. O'Dell, Jr., of Newburgh, N. Y., for Anthony Volkringer.

Harry T. Dolan, of Brooklyn, N. Y., and J. Edward Williams, Acting Head, Lands Division, Department of Justice, Roger P. Marquis, and Kelsey Martin Mott, Attys. Department of Justice, all of Washington, D. C., for appellee.

L. HAND, Circuit Judge.

These are appeals by two claimants from a judgment, condemning parcels of land owned by them adjacent to the Military Academy at West Point, and granting compensation awards. The Village challenges both the judgment of condemnation and its award; Volkringer challenges only his award. The parcels seized were part of a much larger tract taken in 1942 by the Secretary of War: the parcel taken from the Village being about 380 acres of high land west of the Village, constituting most, if not all, of a watershed which supplies the local water company; that taken from Volkringer being eighteen acres of farm land. The alleged invalidity of the judgment of condemnation depends upon the following facts. On March 3, 1931, the Seventy-first Congress, by Public Law 795, 46 Stat. 1491, authorized the Secretary of War to condemn more than 15,000 acres in the vicinity of the Military Academy "provided, That nothing herein contained shall adversely affect the existing water supply, its sources, or pipe lines, of the Town of Highlands, New York." When this act was before the House the representative for the district, in which the Village lies, objected, and, in order to obtain unanimous consent of the House which was necessary for its immediate passage, the Secretary of War, Patrick J. Hurley, wrote a letter to the Board of Trustees of the Village, the Town Board, and the Board of Education, the material part of which appears in the margin.[1] The War Department has never made any effort to acquire the water supply and water system owned by the local water company, nor has it guaranteed to the Village the right to use the water up to the capacity of the present water-shed without charge. It is the position of the Village that the letter contained a promise which became a valid obligation when the Village withdrew its opposition, and that performance became a condition upon the plaintiff's right to condemn.

The petition for condemnation was filed on July 3, 1942; the Village answered on October 26, 1942, and judgment was entered on August 10, 1943, condemning the land and appointing three commissioners of appraisal, as provided in § 14 of the New York Condemnation Law, Consol.

[1] " * * * the War Department will in so far as it has legal authority, take all necessary steps to acquire the land upon which the water supply and system of the Village of Highland Falls is located, including the purchase at a price mutually agreeable, of the interest therein which said Village now owns in the water-shed from which this supply is obtained. When the water-shed is acquired, the War Department will guarantee to said Village of Highland Falls the right to the use of the water up to the capacity of the said Village of Highland Falls' present water-shed without charge.
* * * * * * *
"This statement is made to you for the purpose of obtaining your consent to the bill now pending and will not be binding on either party if said bill fails to be passed by the present Congress."

Laws N.Y. The commissioners held hearings, took testimony, and filed their report on January 12, 1944. They awarded to the Village $12,917.50; and to Volkringer $3750. The evidence of the Village of the value of its property was the testimony of a civil engineer—an expert in water supply systems, but not shown to have had any acquaintance with local real estate. He considered that the "highest available use" for 150 acres of the condemned property was as an adjunct to the existing water supply; the other acreage he considered best fitted for a recreation ground. He computed the value of the 150 acres as follows. If these were added to the existing water system, the net return upon the enlarged system would be $18,000, which he capitalized at three and one-quarter per cent—the highest rate of interest at which the Village had been forced to borrow. This came to $554,000. He estimated the cost to the Village of buying out the present water company at $250,000, and the cost of the new reservoir, which would have to be erected upon the 150 acres, at $195,000. This would include two lakes which could be made to drain into the brook that supplied the existing system, and would serve as a reserve for dry periods, and insure an adequate supply of water. The cost of both these—$445,000—he subtracted from the capitalized value of the system as a whole, leaving $109,000, from which he deducted $19,000, against the possibility that the new reservoir might cost more than he had estimated. The other acreage, which he regarded as best suited for a park, he appraised at $28,000, based upon the possible rentals of vacation and camp sites. The plaintiff called a real estate operator, familiar with the value of country property on both sides of the Hudson River, though not in the immediate vicinity of the tract in question, who appraised the land at $10,000. It is a rough wooded tract, substantially unoccupied, rising steep from the west shore of the Hudson River, and not fitted for farming or permanent building.

Volkringer's farm is made up of eleven acres of ordinary farm land on which there were a two story house, a barn and the usual outhouses. The commissioners appraised the buildings at $1,425, and the farm land at $1,100—$100 an acre. Volkringer does not complain of this award. The other seven acres were what is called "muckland," a swampy parcel filled with a substance, known as "peat-moss," useful as the top dressing of lawns, and for planting trees and shrubs: a "soil builder." Volkringer called as an expert a person acquainted with this substance who computed that there were upon the seven acres about 112,000 cubic yards in situ, which expanded, on being dug out and ground, by about twenty-five per cent. The fair value he estimated at twenty cents a yard.

■■ The Village's defence against the judgment of condemnation is plainly invalid. Even if the Hurley letter had promised to surrender the plaintiff's power of eminent domain, and if that promise had been supported by a valid consideration and been in all other respects valid as a contract inter partes, it would not have tolled the plaintiff's power of eminent domain. That power, like other constitutional powers, not even a legislature can surrender. Pennsylvania Hospital v. Philadelphia, 245 U.S. 20, 38 S.Ct. 35, 62 L.Ed. 124; Galveston Wharf Co. v. Galveston, 260 U.S. 473, 43 S.Ct. 168, 67 L.Ed. 355. Besides, the letter made no promise not to use the power of eminent domain; it did promise, so far as there was "legal authority," to acquire the existing water supply, "including the purchase at a price mutually agreeable," of the Village's interest "in the water-shed from which this supply is obtained," and when it had acquired the water-shed, it promised to guarantee the right to use the water free of charge. At most this went no further than to agree to buy the water-shed, if the parties could fix a "price mutually agreeable." That did not mean that if no such price could be found, the plaintiff should not have the land; and the only way to get it would then be by condemnation. What the Village apparently wanted was that the plaintiff should condemn the existing water system and to give it the water supply gratis. With the validity of that contract we have no concern, the Village is of course free to sue upon it whenever it chooses; but its existence is altogether irrelevant in this proceeding.

■ Coming then to the awards, there was a conflict of testimony, as is usually the case when real property is to be appraised. Strictly speaking, wild land like that here in question has really no market value, and any award is little better than a guess. True, the test is the value of the best available use to which the owner can put it (Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236), but

that helps very little unless that use has at least some prospective effect upon its market value; and in the case at bar the proposed use of the 150 acres was altogether prospective and speculative, and may, or may not, have had any effect whatever. The same was even more true of the other acreage suitable for a park. Volkringer's peat-moss may have had a value greater than the $1225 at which the commissioners appraised it, but clearly not the fanciful estimate based upon his expert's computations. Indeed two of his own witnesses put it far lower—$4,200 and $3,200—: plainly they did not take seriously the other basis of appraisal. Even if the award had been made by a judge, it is at least not apparent that we ought to have held it "clearly erroneous." United States v. Lambert, 2 Cir., 146 F.2d 469. But it was made by a commission and a preliminary question arises as to the extent of our review. Rule 81(a) (7) makes the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, apply to appeals in condemnation cases, and Rule 53(e) (2) makes a master's findings conclusive upon the district judge, if not "clearly erroneous": the same test which applies to the findings of the district court upon an appeal to us. We do not believe that Rule 81(a) (7), applies to the review of a master or referee by the district court in a condemnation case, although, if it did, we should scarcely distinguish between a master or referee and commissioners like these. Hence, since § 258 of Title 40, U.S.C.A., requires us to follow state procedure, we should follow the practice of the New York courts in deciding whether the judge was right in affirming the awards.

That review is strictly limited, owing to the exceptional powers of the commissioners. Section 14 of that act requires them to view the premises to be condemned, and apparently because of this, beginning in 1852 (Troy & Boston Railroad Co. v. Lee, 13 Barb., N.Y., 169), the New York courts have accorded to their awards an extraordinary immunity from review. We have collected a number of the later decisions in the margin,[2] but we shall quote from only two which state the doctrine in somewhat different ways. The first is Matter of Simmons (Ashokan Reservoir), 132 App.Div. 574, 116 N.Y.S. 952, 953, where the court said that information "acquired by the commissioners, independently of the evidence produced by the parties, may properly be utilized by said commissioners. In the very nature of things it does not get into the record and can not be considered by an appellate court. We are obliged to assume, in reviewing * * * that the commissioners acquired and made proper use of such evidence in reaching their conclusion, as well as written evidence produced by parties, and that they also acted upon the personal inspection * * * which the statute requires them to make." As this reads, it may mean that the commissioners may not only inform themselves by viewing the premises, but that they may inquire of others, as ancient jurors were allowed to do; and this certainly was the meaning of Troy & Boston Railroad Co. v. Lee, supra, 13 Barb., N.Y., 169. What is perhaps a more limited statement is that of the Fourth Department in Adirondack Power & Light Corp. v. Evans, 226 App. Div. 490, 492, 235 N.Y.S. 569, 574, repeated in Matter of City of Rochester, 1932, 234 App.Div. 583, 585, 255 N.Y.S. 801: "Unlike a jury, they are not restricted to any particular species of evidence. The authorities are unanimous that they are privileged to act on their own judgment and information obtained from an inspection of the property, as well as on the evidence produced before them." This may mean to confine them to the evidence taken and to what they learn by the view; and we shall

[2] Perkins v. State of New York, 113 N.Y. 660, 21 N.E. 397; Matter of Thompson, 121 N.Y. 277, 24 N.E. 472; City of Syracuse v. Stacey, No. 1, 45 App. Div. 249, 61 N.Y.S. 165; Harlem River & Portchester R. Co. v. Reynolds, 50 App.Div. 575, 64 N.Y.S. 199; Matter of Board of Water Commissioners, 71 App. Div. 544, 76 N.Y.S. 11; Matter of Manhattan Ry. Co. v. Comstock, 74 App.Div. 341, 77 N.Y.S. 416; Matter of Town of Guilford, 85 App.Div. 207, 83 N.Y.S. 312; Matter of Simmons (Ashokan Reservoir), 132 App.Div. 575, 116 N.Y.S. 952; Matter of Willcox, 165 App.Div. 197, 151 N.Y.S. 141; Matter of Castle Heights Water Co. v. Price, 178 App.Div. 687, 165 N.Y.S. 816; Matter of Corporation Counsel of the City of New York, 188 App.Div. 668, 177 N.Y.S. 318; Matter of Bronx Parkway Commission, 192 App. Div. 412, 182 N.Y.S. 760; Adirondack Power & Light Corporation v. Evans, 226 App.Div. 490, 235 N.Y.S. 569; Matter of City of Rochester, 234 App.Div. 583, 255 N.Y.S. 801; Contra: People ex rel. City of New York v. Stillings, 138 App. Div. 168, 123 N.Y.S. 349.

assume that this is the proper doctrine. However, it seems plain that when they view the premises, they must be permitted to do so with an eye to its value, else they could use what they learned only to check the descriptions of the property given by the witnesses. If the view is to be a factor in their final appraisal of value, it can become so only if it is permissible for them to call upon their personal acquaintance with the value of such property; and this is confirmed by the fact that they must be drawn from the neighborhood.

It follows that the award of such a commission is nearly immune from any judicial review, because the record on which that review must be made does not contain all the evidence. How much the commissioners were governed by what they saw, and by any special knowledge they may have had of the value of land in the neighborhood, must needs be unknown. It is true that to some extent this inadequacy invades all records, which necessarily omit what cannot be preserved in print or in some other physical form; and it is because of this that findings of fact have the conclusiveness that they do have. But the difference between the usual situation and that at bar, although only one of degree, is very great, for here not even the skeleton of the missing evidence is preserved. When we reverse an ordinary finding, it is because we see, or think we can see, that all the impalpable and evanescent factors, could not have overweighted those which have been preserved. But when, as here, we have not even a vestige of such possibly decisive factors, it is very seldom that we can act. It is true that the New York courts have always reserved a residual control over such awards. Clearly, if it affirmatively appears that the commissioners have followed a wrong rule law, their award should not stand; and indeed, the award on its face may be so wide of what is in the record that nothing seen on the view and no local acquaintance could justify it. It is enough to say that the case at bar is not of that kind. The commissioners awarded more than the plaintiff's appraisals; and there was nothing in the testimony of the claimants' witnesses that commanded unquestioned acquiescence, or should inevitably have overridden the personal judgment of the commissioners themselves.

Judgment affirmed.